IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Bill Lindsay, | C/A No.: 3:21-cv-02872-DCC |
| Plaintiff, | |
| v. | OPINION & ORDER |
| Delta Pilots Disability and Survivorship Plan, | |
| Defendant. | |

This matter, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), is before the Court on the parties' cross-memoranda in support of summary judgment, ECF Nos. 44, 45, their replies, ECF Nos. 46, 49, and is based on the administrative record, ECF No. 43-1, the governing plan documents, ECF No. 43-2, and the documents attached to the parties' memoranda in support of judgment, ECF Nos. 44-1 to 44-8 and ECF 45-1 to 45-15. For the reasons stated below, the Court finds in favor of Defendant.[1]

**FINDINGS OF FACT**

1. Delta Air Lines, Inc. ("Delta") provides its pilots with a variety of benefits, including the Delta Pilots Disability & Survivorship Plan (the "Plan"), which provides disability benefits to eligible disabled pilots.

---

[1] On July 26, 2024, the undersigned directed the parties to inform the Court whether they believed any additional action was necessary pursuant to the Fourth Circuit's ruling in *Penland v. Met. Life Ins. Co.*, 2024 WL 1528957 (4th Cir. 2024). ECF No. 52. While they disagreed as to the reasons why, the parties agreed that this matter can be decided based on the record before the Court. ECF No. 53. Upon review of the parties' submissions and the applicable law, the Court agrees that no hearing is necessary.

1

2. As of October 1998, Plaintiff qualified for Long-Term Disability benefits under the Plan and began receiving benefits. ECF No. 43-1 at 2, 51.

3. The Plan requires that any Long-Term Disability benefits awarded to a claimant be reduced by the amount of any retirement benefits awarded to the same claimant. [Stipulated Governing Documents, ECF No. 43-2 at 26–27.

4. The Plan further provides that overpayments payable by the Pension Benefit Guaranty Corporation[2] ("PBGC") may be recovered by any means, including by reducing the amount of future Long-Term Disability benefit payments. *Id.* at 48.

5. The various retirement benefits that reduce a participant's Plan benefit are required to be converted to a single life annuity and then applied to reduce the Plan benefit. *Id.* at 26–27. A single-life annuity is a retirement benefit paid for the life of the participant only, while a joint & survivor annuity is an annuity paid for the longer of the life of a participant or another person.

6. The Plan is an ERISA employee welfare benefit plan. ECF No. 43-2 at 7. The plan administrator is the Administrative Committee of Delta Air Lines, Inc. (the "Committee"). *Id.* at 49. The Plan vests the powers to interpret its provisions of the Plan and to decide the amount manner and time of benefits made under the Plan to the Committee. *Id.* at 49–50 (stating that the Committee has the powers to "interpret the Plan, . . . determine the amount, manner, and time of payment of benefits . . . [and to] decide all questions concerning the Plan"). The Plan also provides the Committee or its delegate with the exclusive power to interpret the Plan's terms. *Id.* at 49.

---

[2] The PBGC is a federal government agency that insures defined benefit plans such as the Retirement Plan.

2

7. Delta also previously provided eligible pilots with the opportunity to participate in the Delta Pilots Money Purchase Pension Plan ("MPP Plan").  ECF No. 43-1 at 53 n.1. The MPP Plan was terminated in 2006.  *Id*.  The Plan benefit is offset by the MPP Plan benefit (after the MPP Plan benefit is converted to a single life annuity), and the Plan was also dependent upon PBGC to provide needed offset information concerning MPP benefits.  *Id*.

8. When the MPP Plan was terminated, certain participants received a lump sum payment, including Plaintiff who received a lump sum payment of $32,876.74 on August 21, 2006.  *Id*. at 56.

9. The Plan requires that the Long-Term Disability benefit be offset by the MPP Plan lump sum payment after converting the amount of the MPP Plan lump sum payment to an actuarially equivalent single life annuity.

10. The offset value for the MPP Plan lump sum payment could not be determined by the Plan until Plaintiff made certain benefit elections and the Plan received certain information from the PBGC. *See id.* at 52, 57.  Because the PBGC had to determine the annuitized value of Plaintiff's lump sum payment from the MPP Plan after records detailing MPP Plan distributions were transferred to PBGC, only Plaintiff and the PBGC had access to records of the distribution.  *Id*.

11. The Plan did not receive the MPP Plan offset information until 2018. *See id.* at 52.

12. Delta also previously provided eligible pilots with the opportunity to participate in a defined benefit retirement plan, the Delta Pilots Retirement Plan (the "Retirement Plan"). ECF No. 43-1 at 52.

13. In September 2006, Delta terminated the Retirement Plan. *Id.*

14. Following the termination of the Retirement Plan, benefits previously due under the Retirement Plan (including Plaintiff's) were paid by the PBGC. If the Plan required information concerning former Retirement Plan benefits, it had to obtain that information from the recipient of those benefits or the PBGC, if authorized by the participant. *See id.* at 3, 52.

15. Plaintiff started receiving Retirement Plan benefits from the PBGC in 2010. *Id.* at 52. The PBGC administered and paid Plaintiff his Retirement Plan benefits, and the PBGC communicated with Plaintiff directly. *See* ECF No. 45-3.

16. In June 2011, Plaintiff provided the Plan with a PBGC Income Verification Form. ECF No. 45-4. The Income Verification Form included the following information:

> PENSION DATA
> Name of Participant: Bill Lindsay
> Monthly Gross Amount of Pension Benefit:     $4,529.44
> Date of Initial Benefit: June 1, 2011
> Date of Ending Benefit: Participant's Lifetime

*Id.*

17. Other than the June 2011 Income Verification Form, Plaintiff does not remember supplying any other information to the Plan. ECF No. 45-14 at 7. To the extent he sent any other information, he did not send any information that conflicted with the Income Verification Form. *Id.* at 8. At that time, the only information received by the Plan indicated that Plaintiff's PBGC benefit was for his lifetime. ECF No. 43-1 at 52.

18. The Plan sent Plaintiff written notice explaining how it used the information he provided to set up his "Single Life Annuity" Disability Benefit offset on June 24, 2011, stating:

4

> Thank you [for] providing us with your PBGC award letter pertaining to your estimated pension benefit. Based upon that correspondence we have set up the Single Life Annuity (SLA) offset effective 04/01/10 in the GROSS amount of $4,529.44.

ECF No. 45-5. Because the Plan had been informed that Plaintiff was only receiving a benefit from the PBGC for his lifetime and not for the longer of his lifetime or the lifetime of a survivor, the Plan did not convert the value of the benefit to a single life annuity pursuant to Section 4.03(c)(iii) of the Plan. ECF No. 43-1 at 52–53.

19. The Plan learned that the information it had received was incorrect in 2018. If Plaintiff's benefit had been converted, it would have increased the amount of the offset against Plaintiff's Long-Term Disability benefit from $4,529.44 per month to $7,235.33 per month and would have reduced the monthly amount he would have received by $2,705.89 per month. *See id*.

20. Plaintiff acknowledges that the Plan would have no reason to believe the information provided to it was wrong. ECF No. 45-14 at 9.

21. The Plan learned of this information as part of an audit commissioned by the Plan and conducted by SBA, an independent professional benefit consulting firm.

22. In gathering the necessary information for SBA's audit, the Plan contacted Plaintiff in March 2018 and requested detailed information concerning the way PBGC calculated his pension benefit, or a written authorization to secure the same directly from the PBGC. ECF No. 45-6.

23. In May 2018, Plaintiff provided the Plan with authorization to secure the information it requested in March from the PBGC. ECF No. 45-7. With that information, SBA determined that Plaintiff's offset should have been $7,235.33 per month, not $4,529.44 per month. ECF No. 43-1 at 13–18, 55–70. Accordingly, from April 2010

5

through February 2020 Plaintiff received an overpayment from the Plan totaling $322,000.91.[3]  *Id.* at 13–18.

24. On March 26, 2020, the Plan shared the results of the SBA audit with Plaintiff in writing and notified Plaintiff of the overpayment and his corrected payment.  *Id.* at 27–28.  This letter notified Plaintiff that the overpayment was due to an incorrect offset based on the information provided.  *Id.* at 27, 30–34.  When it sent the letter, the Plan supplied Plaintiff with data supporting SBA's calculation of the correct offset amount.  *Id.* at 30–34.  As required by Section 10.07 of the Plan, Plaintiff was told he had "45 days from the date of the letter to contact the D&S Plan to make arrangements for repayment."  *Id.* at 27.

25. The Plan also notified Plaintiff that he could appeal its offset benefit determination.  *Id.* at 28.

26. Plaintiff responded to the Plan, through his counsel, on June 9, 2020, and appealed (the "First Appeal").  *Id.* at 22.  Plaintiff requested that the Committee begin its review of Plaintiff's offset determination but not complete that review until Plaintiff provided additional information.  *Id.*  Next, Plaintiff requested and received information from the Committee concerning Plaintiff's monthly Long-Term Disability offset.  *Id.* at 22–23.  Finally, Plaintiff requested that the Plan not adjust the amount of the Long-Term

---

[3] $7,235.33 is the actual value of Plaintiff's PBGC pension benefit plus his MPP Plan benefit, each as converted to a Single Life Annuity form under Section 4.03(c)(iii) of the Plan.  $4,529.44 was the amount of Plaintiff's PBGC pension benefit provided in the Income Verification form.  The difference between the actual value of Plaintiff's PBGC pension benefit plus his MPP Plan benefit, each as converted to a single life annuity, and the erroneous sum is $2,705.89. ($7,235.33 - $4,529.44 = $2,705.89).  Plaintiff received an overpayment resulting from an inflated Long-Term Disability benefit during the 119-month period beginning in April 2010 and ending in February 2020.

6

Disability benefit paid to him to reflect the proper offset, or take any other action to recoup the overpayment, until the administrative process was completed. *Id.*

27. On November 4, 2020, the Administrative Subcommittee ("Subcommittee") acknowledged receipt of Plaintiff's First Appeal and notified Plaintiff that he should soon receive a copy of the information he requested and provided an address where he could send further information if needed. *Id.* at 25.

28. On December 1, 2020, Plaintiff's counsel wrote to the Subcommittee asking for certain documents, and the Subcommittee provided that information 13 days later. *Id.* at 36, 38–39.

29. On March 22, 2021, the Subcommittee notified Plaintiff, through his counsel, that it upheld its Long-Term Disability benefit offset determination. *Id.* at 41–43. The Subcommittee directed Plaintiff to the applicable Plan provisions, Section 4.03(c)(iii) explaining that Long-Term Disability Benefits are offset, dollar for dollar, by the value of the retirement benefits after converting the value of his retirement benefits to a single life annuity form, and Section 10.07 explaining the applicable overpayment and recoupment provisions. *Id.*

30. The Subcommittee then summarized the key facts explaining:

- Plaintiff last worked on April 1998;

- Plaintiff began receiving Long-Term Disability in October 1998;

- Plaintiff began receiving PBGC pension benefits on April 1, 2010;

- Since Plaintiff received Long-Term Disability benefits and PBGC pension benefits, the Offset Provision (Section 4.03(c)(iii)) of the Plan applied;

- The Plan obtained information directly from the PBGC as part of the SBA audit;

7

- The SBA audit revealed that Plaintiff was overpaid $322,000.91;

- Plaintiff was advised of the overpayment on March 26, 2020;

- Plaintiff appealed.

*Id.* at 42.

31. The Subcommittee reviewed all information provided by Plaintiff along with the information in the administrative record when considering his First Appeal. *Id*. The Subcommittee notified Plaintiff that he had the right to appeal that determination to the Committee and provided him with the information necessary to do so. *Id.* at 43.

32. On April 21, 2021, Plaintiff submitted a second-level appeal (his "Final Appeal"). *Id.* at 8. Substantively, his Final Appeal was identical to his First Appeal.

33. On June 8, 2021, the Committee acknowledged receipt of Plaintiff's Final Appeal. *Id.* at 45. The acknowledgement notified Plaintiff of the next steps to expect as well as where to send or request additional information. *Id.*

34. Plaintiff submitted an affidavit for review in support of his Final Appeal. *Id.* at 48. In his affidavit, after reciting facts about the audit summarized above, Plaintiff opined that he is not responsible for the overpayment:

> 7. I respectfully submit that I am not responsible for the overpayment for several reasons. First and foremost, the D&S Plan had all of my relevant retirement benefit information since I provided it to them in 2011. Certainly, the Administrative Committee of the D&S Plan, and the plan itself, are in the best position to accurately determine the amount of any relevant offset under the plan. It possesses superior knowledge of the terms of the plan and, as a result, has all of the necessary told to correct [sic] apply offsets pursuant [sic] those plan terms, and possesses vastly more experience in applying said offsets that I, as a claimant, do. [sic] Second, the D&S Plan knew or should have known that the amount of the original offset was allegedly incorrect in at least 2011. Finally, the D&S Plan had the ability to discover the alleged

8

> discrepancy in the offset amount at any time from 2011 until it performed the audit in 2020.
>
> 8. The Administrative Committee of the D&S Plan, as a fiduciary of the long term disability plan, has the absolute duty and responsibility to ensure that offsets are applied correctly. Beyond that, it has the responsibility to periodically review claims to determined whether or not offsets are applied appropriately. The D&S Plan did not undertake any review of audit of my long term disability claim from the time I began drawing PBGC benefits in June 2011 until it asserted the alleged overpayment in March 2020.

*Id.* at 47 at ¶¶ 7-8. In the course of this litigation, Plaintiff acknowledged that the Plan would have had no reason to know of the overpayment. ECF No. 45-14 at 9.

35. The affidavit, which was the only substantive information Plaintiff provided during his appeals, did not address the terms of the Plan, argue those provisions do not apply, or argue those terms had been misapplied. ECF No. 43-1 at 48. Nor did it add any new facts to those before the Committee or dispute the correctness of the calculation itself. *Id*.

36. On October 19, 2021, the Committee notified Plaintiff that it upheld its Long-Term Disability benefit determination. *Id.* at 51. The Committee directed Plaintiff to the applicable Plan provisions and provided those to him as an exhibit to the final benefit determination. *Id*.

37. The Committee considered all of the information in the administrative record, including Plaintiff's affidavit, when making its benefit determination. *Id.* at 51–52. The Committee also summarized the key facts. *Id*. The Committee explained that after reviewing the Income Verification Form from the PBGC in 2011, the Plan understood that Plaintiff was receiving a single life annuity from the Retirement Plan because the Income Verification Form stated that Plaintiff received $4,529.44 as a monthly gross pension

9

benefit for his lifetime, and under the Plan the offset is based on a single-life annuity so no conversion of the Plaintiff's Retirement Plan benefit was needed prior to determining the amount by which to offset his Long Term Disability benefit from the Plan. *Id*. The Committee learned Plaintiff was receiving a joint and survivor annuity from the PBGC in May 2018. *Id*. The Committee also learned the information required to annuitize the lump-sum payment Plaintiff received in connection with the termination of the MPP Plan in May 2018. *Id*. In total, the value of the benefits Plaintiff was receiving from the Plan included $2,705.89 in extra monthly payments due to an incorrect offset under Section 4.03(c)(iii) of the Plan—his offset should have been $7,235.33 per month instead of $4,529.44 per month. *Id*. As this overpayment had been occurring for 119-months starting in April 2010, the total overpayment Plaintiff owed to the Plan was $322,000.91. *Id*. Thus, the Plan required repayment of the $322,000.91 overpayment. *Id*. The Committee recognized the difficult situation but explained that "it has the legal, fiduciary responsibility to administer the Plan according to its terms and to decide benefit appeals fairly and uniformly in the best interests of all Plan participants and beneficiaries. This responsibility includes ensuring that Plan participants receive only the benefits they are entitled to under the terms of the Plan." *Id*.

## PROCEDURAL HISTORY

On September 3, 2021, Plaintiff filed a Complaint against the Plan in this Court. ECF No. 1. In his Complaint, Plaintiff alleges that the Plan seeks repayment of $322,000.91 in long-term disability benefits. Plaintiff styled his only cause of action as a claim for equitable relief under 29 U.S.C. § 1132(a)(3). *Id*. Plaintiff's Complaint alleges the Plan should not have made a mistake in calculating his benefit because of its superior

experience applying Plan terms.  *Id*.  On February 24, 2023, the Parties filed their cross motions for summary judgment.  ECF Nos. 44, 45.  Plaintiff claims that the Court should preclude the Plan from recovering the overpayment due to laches.  Both parties filed replies.  ECF No. 47, 49.

## CONCLUSIONS OF LAW

The Court must first determine which ERISA provision is applicable to the current action.  Plaintiff asserts that this case is brought pursuant to 29 U.S.C. § 1132(a)(3), which provides that an ERISA action may be brought:

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).  This provision is known as a "catchall" provision and claimants may not choose to proceed under a "catchall" provision where ERISA provides a remedy elsewhere.  *Varity Corp. v. Howe*, 516 U.S. 489 (1996) (explaining that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'"); *Korotynska v. Met. Life Ins. Co.*, 474 F.3d at 102-03 (4th Cir. 2006) ("Individualized equitable relief under § 1132(a)(3) is normally appropriate only for injuries that do not find adequate redress in ERISA's other provisions. Because adequate relief is available for the plaintiff's injury through review of her individual benefits claim under § 1132(a)(1)(B), relief under § 1132(a)(3) will not lie." (internal citation omitted)).  To that end, Defendant asserts that this claim is properly considered pursuant to 29 U.S.C. § 1132(a)(1)(B), which addresses specific injuries and creates a cause of action for a participant to recover

11

benefits, enforce rights, or clarify rights to future benefits. It specifically provides that an ERISA action may be brought

>  (1) by a participant or beneficiary—
>
>  ***
>
>  (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

29 U.S.C. § 1132(a)(1)(B).

The Court agrees with Defendant that this action is properly considered pursuant to 29 U.S.C. § 1132(a)(1)(B). As an initial matter, Defendant is not a proper party to a breach of fiduciary duty suit. Further, while Plaintiff tries to frame this action as a request for equitable relief, it is really a challenge to the Subcommittee's determination of benefits. This challenge is provided for under 29 U.S.C. § 1132(a)(1)(B). *Korotynska*, 474 F.3d at 107 (holding that § 1132(a)(1)(B) "affords the plaintiff adequate relief for her benefits claim, and a cause of action under Section 1132(a)(3) is thus not appropriate"); *see T.S. v. Anthem Blue Cross Blue, Shield*, No. 1:23-CV-60-MOC, 2023 WL 5004499, at *2 (W.D.N.C. Aug. 4, 2023) (finding the plaintiff's § 1132(a)(3) claim was duplicative of his § 1132(a)(1)(B) claim where the underlying injury is the same and arose out of a denial of a benefit); *Harp v. Liberty Mut. Grp., Inc.*, No. 1:12CV640, 2013 WL 5462290, at *4 (M.D.N.C. Sept. 30, 2013) (holding that the plaintiff's claim must proceed under § 1132(a)(1)(B) when the claimant argued that she sought relief traditionally available at equity while characterizing her claim under § 1132(a)(3), reasoning that plaintiff failed to explain why that claim was not redressable under § 1132(a)(1)(B)). Because § 1132(a)(1)(B) provides an adequate remedy for a claim like Plaintiff's claim, which seeks

an order from this Court determining the amount of long-term disability benefits he may keep, the amount of long-term disability benefits he must return, and the method by which he must return them, Plaintiff may not proceed under § 1132(a)(3).[4]

The standard of judicial review under § 1132(a)(1)(B) "turns on whether the benefit plan at issue vests the administrator with discretionary authority." *Helton v. AT&T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If the benefit plan "vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion." *Id*. (internal quotation marks and citation omitted). "If a plan does not give the administrator discretionary authority, a district court reviews the coverage determination *de novo*." *Id*. Under the abuse of discretion standard, a court may not substitute its own judgment for that of the Committee. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629 (4th Cir. 2010). "At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it

---

[4] Further, even if Plaintiff were able to proceed under § 1132(a)(3), her claims would still fail. First, Plaintiff cannot prevail on her claim against Defendant because Defendant is not a fiduciary and she therefore cannot state a claim for fiduciary breach. *Coleman v. Nationwide Ins. Co.*, 969 F.2d 54, 60–61 ("Before one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of 'fiduciary.'"). Further, the Court finds that laches does not apply here. The facts show that the Plan only learned of the overpayment in or around 2018. Plaintiff submitted the mistaken information and there is nothing in the record to suggest that the Plan exhibited a lack of due diligence in applying the mistaken information to determine Plaintiff's benefits. Accordingly, laches does not assist Plaintiff here.

would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008).

In this case, the Plan grants the Committee the exclusive power to "interpret the Plan . . . determine the amount, manner, and time of payment of benefits . . . [and] to decide all questions concerning the Plan." ECF No. 43-2 at 49–50. Accordingly, this Court reviews the Committee's decision for abuse of discretion.

The Fourth Circuit has identified a number of nonexclusive factors that a court may consider in reviewing a plan administrator's decision for reasonableness. See *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). The factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id*. Not all factors are relevant in every case. *Helton*, 709 F.3d at 357.

The first *Booth* factor weighs in favor of the Plan because the language of the Plan required the Committee to offset Plaintiff's Long-Term Disability benefits and recoup overpayments. The second factor weighs in favor of the Plan because one of the goals of the Plan was to ensure that all participants were paid fairly, and neither underpaid nor overpaid. The third factor favors the Plan because it reviewed all of the relevant

14

information, including any and all information Plaintiff submitted.  The fourth factor weighs in favor of the Plan because the Plan's reasoning was consistent during all phases of the appeal and with other overpayment decisions.  The fifth factor favors the Plan because the Committee thoroughly explained its determination, and provided further explanation when Plaintiff provided further argument.  The sixth and seventh factors also favor the Plan because the review of Plaintiff's claim was consistent with ERISA's claims management regulations.

Finally, the eighth factor favors the Plan as there was no conflict of interest.  The Plan's offset determination was conducted by an outside firm that specialized in benefit consulting and received no compensation based on the results of the audit.  ECF No. 45-1 at ¶ 3.  Moreover, the Plan evenhandedly followed the results of the audit, paying out or crediting over $30,000,000 to those who were underpaid.  It is only reasonable for the Committee to also require repayment by those overpaid.  The members of the Committee also received no financial incentive based on the outcome of their benefit determination, and the evenhanded response of the Committee eliminates any reasonable claim of a conflict of interest.  Plaintiff also agrees the Committee did not operate under a conflict of interest.  Thus, the *Booth* factors support the decision of the Plan.[5]

## CONCLUSION

For the reasons set out herein, is hereby ordered that the Defendant's memorandum in support of judgment is granted, and that Plaintiff's memorandum in support of judgment is denied.

---

[5] With respect to any ability to repay the overpayment from the Plan, the Court finds that this is an issue that does not require a resolution.  Defendant states that it has not requested repayment from Plaintiff's personal funds.  ECF No. 49 at 3.

15

IT IS SO ORDERED.

**s/ Donald C. Coggins, Jr.**
United States District Judge

September 13, 2024

Spartanburg, South Carolina